

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANTHONY SIMPKINS, )
)
Plaintiff, )
) No. 15 CV 9103
v. )
) Hon. Charles R. Norgle
DUPAGE HOUSING AUTHORITY and )
DHA MANAGEMENT, INC., )
)
Defendants. )

### OPINION AND ORDER

Plaintiff Anthony Simpkins ("Plaintiff") sues Defendants DuPage Housing Authority ("DHA") and DHA Management, Inc. ("DHA Management") (collectively, "Defendants") for several employment law violations. Specifically, Plaintiff brings five claims alleging that Defendants violated: (1) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, for failure to pay overtime wages; (2) the Illinois Minimum Wage Law ("IMWL"), 820 ILCS § 105/1 *et seq.*, for failing to pay overtime wages at the statutorily required rate; (3) the Illinois Employee Classification Act ("IECA"), 820 ILCS § 185/1 *et seq.*, for erroneously failing to classify Plaintiff as an employee rather than an independent contractor; (4) the Illinois Prevailing Wage Act ("IPWA"), 820 ILCS 130/0.01 *et seq.*, for failing to compensate Plaintiff at no less than the prevailing hourly wage for the duration of Plaintiff's work for Defendants; and (5) the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, for evading their FMLA obligations and interfering with, restraining, and discouraging the exercise of Plaintiff's FMLA rights. Before the Court are Plaintiff's motion for partial summary judgment and Defendants' motion for summary judgment. For the reasons set forth below, Plaintiff's motion is denied, and Defendants' motion is granted as to the federal claims and denied without prejudice as to the

state claims. The Court relinquishes jurisdiction over the state claims, and they may be refiled in the appropriate state court.

## I. BACKGROUND

DHA operates low-rent housing programs administered by the United States Department of Housing and Urban Development, the State of Illinois, and DuPage County. DHA is organized as a nonprofit corporation under the laws of the State of Illinois and has roughly thirty employees. DHA Management is a wholly-owned subsidiary of DHA. DHA Management served as the entity that provided on-site management for Ogden Manor ("Ogden"), an apartment and townhome community supported through a project-based federal housing program. DHA Management is comprised solely of individuals who are also on DHA's Board. DHA Management has no office and has the same registered address as DHA.

In 2009, Plaintiff began working for Defendants. He was never a part of a union. Plaintiff primarily performed carpentry, maintenance, and handyman work such as demolition, remodeling, the removal of fixtures, and taking out the trash. Plaintiff initially worked on properties related to the Neighborhood Stabilization Program ("NSP"), which involved rehabbing vacant homes in order to make them available to suitable occupants. He worked on roughly ten NSP properties and a few satellite properties. In 2011, when the NSP work slowed down, Plaintiff began working at Ogden. At this point, Plaintiff worked predominantly at Ogden and only occasionally on a limited number of NSP properties. The kind of work Plaintiff completed did not materially change at first, but when Ogden's maintenance technician Gary Germain ("Germain") took an extended leave of absence, Plaintiff focused more specifically on maintenance work, which continued even after Germain returned to his post. Germain separated from Defendants in early 2013.

Defendants employed Don Demetry ("Demetry") and Barney Dahl ("Barney").[1]
Demetry was Ogden's property manager, and Barney served as the maintenance supervisor.
From 2011 to 2014, Demetry and Barney gave Plaintiff lists of his job duties and prioritized the
order in which Plaintiff needed to complete his tasks. Demetry and Barney would also provide
Plaintiff with a scope of the work. Barney would place work orders on a desk given to Plaintiff
for Plaintiff to pick up and scheduled Plaintiff's work around and in sequence with other
contractors' work. Still other contractors, such as Steve Petry ("Petry") and Alfonso Torres,
worked alongside Plaintiff. Demetry and Barney ultimately separated from Defendants in
September 2014.

After Demetry and Barney left Defendants' enterprise, Deb Darzinskis ("Darzinskis"),
DHA's executive director, discussed with Plaintiff the manner in which she wanted him to
submit his invoices. After that conversation, Plaintiff never reported his hours by any method
other than the invoices. Essentially, he would write his hours and submit them to Michelle
Laraia ("Laraia"), the interim property manager and supervisor, for review and confirmation. At
this point in time, Laraia and Darzinskis would dole out Plaintiff's assignments. On December
31, 2014, Darzinskis retired, and Kenneth Coles took over as the executive director. Although
Defendants set forth and prioritized Plaintiff's tasks, Plaintiff completed those tasks largely in
the manner in which he saw fit throughout the time that he worked for Defendants. Finally,
Plaintiff, at times, signed for packages and filled out order forms.

Defendants, in one instance, issued Plaintiff a written warning on a pre-printed template
that contained an "Employee" field. The incident report stemmed from an Ogden resident's
complaint that Plaintiff allegedly asked invasive questions and made racist comments. For a

---

[1] The Court refers to Barney Dahl by his first name because two of Defendants' employees have the last name "Dahl."

3

brief period, Plaintiff, with Defendants' approval, was allowed to sign for Defendants to contract out certain jobs.

Plaintiff communicated with Defendants regarding his employment classification. He repeatedly requested that his superiors make him a regular employee, and he was aware that Defendants considered him an independent contractor. Further, in March 2015, Cohen-Ersey, LLC ("Cohen"), a third-party management company, took over the property management at Ogden. Cohen eventually posted a job opening seeking a maintenance technician. Although Plaintiff expressed his interest in the position, Cohen did not hire him for the posted job.

Plaintiff's method of payment and tax forms differed from those of Defendants' employees. Within weeks of entering the working relationship, Plaintiff discussed with Defendants that he would need to meet certain insurance requirements on his own in order to work on the properties. Plaintiff proceeded to pay an insurance broker to procure the necessary policies. He did not receive pension, insurance, or other fringe benefits from Defendants. Shortly after the parties' working relationship commenced, Plaintiff began submitting invoices to Defendants charging for his work. While Defendants paid Plaintiff by paper checks upon receipt of the submitted invoices, those deemed employees did not invoice Defendants, and they received direct deposit payments less tax deductions. For example, the parties state that Maintenance Technician Germain never submitted an invoice. Plaintiff was generally paid on a bi-weekly basis; however, independent contractors often received payment on completion of a project.

Around the same time that Plaintiff started working for Defendants, Defendants engaged other contractors to do similar work at other properties. Plaintiff was issued an IRS 1099 tax form, typically used for independent contractors when filing taxes. Plaintiff worked directly

with his accountant to take tax deductions in his 1099 tax submissions. Like Plaintiff, Defendants issued these forms to a number of other individuals that they engaged as independent contractors, such as Petry and others that Plaintiff identified in his deposition as Mike, Steve, and Ray. These other independent contractors were tasked, for example, with carpentry work, snow removal, and landscaping. Conversely, those who were considered employees received W-2 tax forms.

Plaintiff also received higher compensation than those he considered his superiors. Demetry, Barney, Laraia, and Cyndi Dahl ("Cyndi")[2] all, at least at certain times, made less money than Plaintiff.

The parties also entered into two separate written agreements labeled "Independent Contractor Agreement." Plaintiff signed both. The first agreement is dated November 1, 2009. Plaintiff admits that he signed the agreement, but contends that only received the last page of the contract. Defendants never represented to Plaintiff that, contrary to the terms of the agreement, he would be classified as an employee. Plaintiff also complied with important contractual terms. For example, the contract required Plaintiff to obtain worker's compensation insurance, which he did for at least of portion of his working relationship with Defendants. Regarding the method of payment, the Independent Contractor Agreement called for compensation to become due and payable upon receipt of an invoice from Plaintiff. As previously stated, Plaintiff routinely submitted invoices in order to receive payment.

Although Plaintiff disputes that he invested significantly in his own materials, the deposition testimony showed otherwise. Plaintiff's 1099 tax forms reflect that he made capital investments in work-related items such as a cellular phone, special work clothes, boots, printers,

---

[2] The Court refers to Cyndi Dahl by her first name because two of Defendants' employees have the last name "Dahl."

tools, and a toolbox and that he made deductions for vehicle depreciation due to the consistent use of his own pickup truck.

Prior to Defendants engaging Plaintiff, Plaintiff did carpentry work for his father's company while he was in high school. He also worked at a company doing winterization work, where he hung plastic coverings used to seal openings on the sides of buildings in order to keep heat in. However, Plaintiff had no related special licenses.

Plaintiff's working relationship with Defendants culminated in May 2015, when he suffered injuries in a car accident, preventing him from returning to his job duties.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where no genuine issues of material fact exist, and the movant is entitled to judgment as a matter of law. Selective Ins. Co. of S.C. v. Target Corp., 845 F.3d 263, 265 (7th Cir. 2016), as amended (Jan. 25, 2017). Where parties file cross-motions for summary judgment, the standard of decision does not change. Id. The Court "take[s] the motions one at a time," Black Earth Meat Mkt., LLC v. Vill. of Black Earth, 834 F.3d 841, 847 (7th Cir. 2016), and "construe[s] all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." Target Corp., 845 F.3d at 265 (internal quotation and citation omitted).

Here, Plaintiff moves for summary judgment exclusively with respect to whether he is legally considered an employee or an independent contractor. In their motion for summary judgment, Defendants argue that all five of Plaintiff's counts should be resolved in their favor. As an initial matter, the Court does not consider Plaintiff's employment status under the FMLA

because both parties agree that Plaintiff cannot prevail on that theory of recovery.[3]  Summary

judgment is therefore granted in favor of Defendants as to the FMLA claim.

## B.  Plaintiff Is Not an Employee Under the FLSA

The Court turns to whether Defendants properly classified Plaintiff as an independent

contractor pursuant to the FLSA.  Because both parties move for summary judgment on this

issue and incorporate their arguments from one motion into the other, the Court analyzes the

parties' positions simultaneously.

"The ultimate question of whether an individual is an employee or an independent

contractor is a legal conclusion which involves an application of the law to the facts."  EEOC v.

North Knox School Corp., 154 F.3d 744, 747 (7th Cir. 1998) (internal citation and quotation

omitted).  Courts construe the terms "employee" and "employer" broadly.  Berger v. Nat'l

Collegiate Athletic Ass'n, 843 F.3d 285, 290 (7th Cir. 2016) (citing Vanskike v. Peters, 974 F.2d

806, 807 (7th Cir. 1992)).  However, "the definition of 'employee' 'does have its limits.'"  Id.

(quoting Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 295 (1985)).  The

determination of "employee" status requires courts to examine the totality of the circumstances;

technical labels are not outcome determinative.  Id.  (citation omitted).  This depends on the

"economic reality of the working relationship between the alleged employee and the alleged

employer to decide whether Congress intended the FLSA to apply to that particular relationship."

Id. (quoting Vanskike, 974 F.2d at 808) (internal quotation marks omitted).

The Seventh Circuit has fashioned "a variety of multifactor tests."  Id.  Courts commonly

follow the factors laid out in U.S. Dep't of Labor v. Lauritzen: "1) the nature and degree of the

alleged employer's control as to the manner in which the work is to be performed; 2) the alleged

---

[3] Plaintiff specifically states that he "does not oppose dismissal of [his] FMLA claim."  Pl.'s Resp. in Opp. to Defs.'
Mot. for Summ. J. at 9.  He concedes that "[t]he Defendants are correct that [Plaintiff] remains injured from his
accident and that the time period under which he would be eligible to return has [] passed."  Id. at 9 n. 5.

employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged

employee's investment in equipment or materials required for his task, or his employment of

workers; 4) whether the service rendered requires a special skill; 5) the degree of permanency

and duration of the working relationship; 6) the extent to which the service rendered is an

integral part of the alleged employer's business." 835 F.2d 1529, 1534–35 (7th Cir. 1987). "No

criterion is by itself, or by its absence, dispositive or controlling." Id. at 1534. The court of

appeals has also stated that courts may decline to apply multifactor tests "when they 'fail to

capture the true nature of the relationship' between the alleged employee and the alleged

employer." Berger, 843 F.3d at 291 (quoting Vanskike, 974 F.2d at 809). In this case, the Court

finds that certain of the Lauritzen factors are useful guideposts, but other factors are crucial in

ascertaining the true economic reality of the business relationship.

### i. Relevant Lauritzen Factors

#### a. Control

An entity's exertion of control over a plaintiff garners particular importance. North Knox

School Corp., 154 F.3d at 747 (discussing factors of employment classification under other

federal statutes and stating that an "employer's right to control is the most important factor when

determining whether an individual is an employee or an independent contractor.") (internal

citation omitted). In Estate of Suskovich v. Anthem Health Plans Of Virginia, Inc., 553 F.3d 559

(7th Cir. 2009),[4] the Seventh Circuit addressed a number of issues that arise in this case.

First, Plaintiff asserts that he had a set schedule requiring him to work from 8:30am to

4:30pm. On his view, this evinces an employer/employee relationship. Plaintiff cites Laraia's

deposition testimony stating these set hours in support of his position. However, the Suskovich

---

[4] The Court recognizes that the analysis in Suskovich also involved principles of common law. While the FLSA utilizes a "broader definition of employee than the common law," id. at 565, to determine the nature of employment classification, the Court finds that the issues and analysis have sufficient overlap to be substantially persuasive.

court stated that "[m]erely setting a work schedule is not sufficient to support a finding that a given person is an employee rather than an independent contractor." Id. at 566. Accordingly, the Court finds that this argument fails to support Plaintiff's position.

Plaintiff also argues that his specific job assignments show that he was an employee. He was first assigned to rehab NSP properties until 2011 when that project slowed down. Thereafter, Defendants assigned him specifically to Ogden. However, "the fact that a person is required to be at a given place at a given time or assigned project work [is not] sufficient to support an employer-employee relationship." Id. (citing Alexander v. Rush North Shore Medical Center, 101 F.3d 487, 493 (7th Cir. 1996)). Thus, these assignments also fail to support an employee status. Taken together, the critical facts cited by Plaintiff do not indicate that he was an employee.[5]

The pertinent facts instead show an independent contractor relationship. Other similarly situated workers were independent contractors. Although he disputes this fact, Plaintiff's deposition testimony ultimately confirms his understanding that others who completed similar work were independent contractors. At his deposition, Plaintiff was asked whether he got the impression that others did the same work and, if so, whether those individuals were independent contractors. Although he initially answered that these individuals were not independent contractors, he immediately followed that statement by saying that these people were instead "just regular contractors." Defs.' Statement of Facts ("DSOF"), Ex. 8, Plaintiff's Deposition Trans. ("Pl.'s Dep.") at 31:9. The record reflects no support for distinguishing "regular contractors" from independent contractors. To the contrary, Plaintiff later testified that DHA issued several other individuals 1099 forms for work similar to Plaintiff's responsibilities. For

---

[5] The Court finds it immaterial that Plaintiff had to consistently take out the garbage out. The parties' dispute over whether he could wear tank tops or shirts with writing also does not materially affect Plaintiff's employment status.

example, Plaintiff stated that "Steve and Ray…Travis [and] Dave…They were all 1099." Id. at 171:1-7. These workers completed jobs such as painting, landscaping, carpentry, and snow removal—all maintenance and carpentry tasks like Plaintiff's duties. Thus, the deposition testimony indicates that those similarly situated had an independent contractor relationship with Defendants.

Plaintiff's freedom to complete projects as he saw fit further demonstrates that he was an independent contractor. The parties agree that Defendants' employees assigned Plaintiff certain projects. However, Barney's declaration asserts that once the projects were assigned, Plaintiff generally executed them as he saw fit except in emergency situations. Barney would "see to it that the scope of work was completed, but [Barney] did not control how [Plaintiff] performed his tasks or tell him how to do his work. Often [Barney] was not on site…while Plaintiff was performing his work." DSOF ¶ 73, Ex. 12, Dahl Decl. ¶ 15.

Plaintiff asserts that because Defendants' employees dictated the projects' order of priority, they exerted control over him. But, there is nothing unusual about an entity working with an independent contractor dictating or prioritizing the assigned jobs. The critical aspect is that Plaintiff had substantial freedom to complete the substance of his assigned tasks in the manner he desired once he received his assignments. Accordingly, Plaintiff's reliance on the fact that Defendants assigned and prioritized the projects does not create a material factual dispute as to the freedom with which he carried out his tasks. Rather, the freedom Plaintiff had to complete his work reflects an independent contractor classification.

Finally, the Court rejects Plaintiff's argument that a written reprimand identifying him as an "Employee" with the job title "Maintenance Technician" demonstrates the exertion of control. Labels are not outcome determinative. As Defendants point out, the written reprimand was a

10

pre-printed form template, and they simply typed Plaintiff's name and job title into the "Employee" and "Job Title" fields, respectively. See Defs.' Resp. in Opp. to Pl.'s Mot. for Summ. J. at 7; Pl.'s Statement of Facts, Ex. E, Corrective Action Notice. The notification details an Ogden resident's complaint regarding Plaintiff allegedly seeking personal and confidential information and making racist comments. Defendants' decision to formally look into such an incident is unsurprising whether the alleged perpetrator is an employee or an individual working in an independent capacity. The content of the notice does not support Plaintiff's position; to find otherwise would be to place form over substance. For the all of these reasons, the control factor favors independent contractor status.

### b. Opportunity for Profit or Loss

The Court finds the opportunity for profit or loss factor does not substantially influence the employment status determination. Plaintiff cites Solis v. Int'l Detective & Protective Serv., Ltd., 819 F. Supp. 2d 740, 751 (N.D. Ill. 2011) in support of the proposition that hourly wages show an employment status. However, Defendants correctly point out that there is authority showing that, given the entire factual palette, hourly wages may not be a weighty issue in the employment classification determination. For example, Defendants point out that Suskovich affirmed summary judgment on an FLSA claim in which the plaintiff was paid hourly. 553 F.3d at 561; see also Glascock v. Linn Cty. Emergency Med., PC, 698 F.3d 695 (8th Cir. 2012) (finding a physician paid hourly to be an independent contractor in a Title VII claim); Carrell v. Sunland Const., Inc., 998 F.2d 330 (5th Cir. 1993) (FLSA case finding that hourly wages are indicative of an employment relationship, explaining that the analysis is "very fact dependent," and ultimately finding that the economic realities as a whole showed that plaintiffs were

11

independent contractors). The Court agrees with Defendants that little weight should be afforded to Plaintiff's hourly wages in the context of the other factors analyzed throughout this discussion.

### c. Investment in Instrumentalities of the Job and Opportunity for Profit and Loss[6]

The investment in equipment or materials, otherwise stated, capital, required for the performance of job duties favors a finding of independent contractor status. See Lauritzen, 835 F.2d at 1535. Here, Plaintiff's tax returns show that he made substantial investments in his own work materials. Although Plaintiff insisted in his deposition testimony that he did not purchase most of the materials that he used in order to perform his duties, specific documents referred to during the deposition show that he claimed such materials in order to receive tax deductions. Plaintiff's brief concedes as much. Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 11 ("Plaintiff certainly acknowledges that he made deductions of approximately $8,000 to $10,000 per year on his income taxes as business expenses for things like a cellular phone, vehicle depreciation, clothing, printers, tools, etc....").

At his deposition, Plaintiff identified as his own a Schedule C form 1040 regarding profits or losses from business for the year 2015. However, Plaintiff denied that the materials claimed for that year were in fact intended to be encompassed by that form. He stated that his accountant told him to put this information in his tax documents because the accountant "said that when you have the 1099 you can reduce how much you pay in taxes and you had this much allowance on certain categories, and [Plaintiff] let him do what he did...[The accountant] would ask [Plaintiff] questions and [Plaintiff] would just say [on his] cell phone, yes. [The accountant would] say how much. [Plaintiff would] say [the amount] and [the accountant] would adjust the

---

[6] The Court notes that the capital investment factor is interrelated with the profit and loss factor. Lauritzen, 835 F.2d at 1537.

price or not." Pl.'s Dep. at 141:22-142:1-6. To the extent this argument is construed to suggest that one need not provide truthful information to the IRS, the Court rejects that position. Cooperating with one's tax accountant is insufficient to negate the responsibility of giving truthful information to the IRS. See 26 U.S.C. § 7206 (Internal Revenue Code stating that willfully making declarations under penalties of perjury, which the signatory does not believe to be true and correct shall be a felony).

Plaintiff further contradicted his initial position that he did not invest in his own materials when asked about purchasing special work clothes and tools. At his deposition, Plaintiff denied purchasing special work clothes, but proceeded to state that he instructed his accountant "to indicate that [he] had purchased work clothes in 2015[.]" Pl.'s Dep. at 142:12-14. The pattern of contradiction continued with respect to tools and work boots. Plaintiff denied purchasing a toolbox or work boots. However, he once more contradicted his initial statement by testifying that he was aware "that for the years 2010-2014 there are similar itemized expenses like these[.]" Id. 143:5-7. He listed these as business income expenses. Except for using a DHA pickup truck for mud and dirt in order to preserve the condition of his own truck, Plaintiff testified that he relied on his own vehicle "[a]ll the time." Id. 145:12. The use of instrumentalities in connection with Plaintiff's job duties therefore shows an independent contractor relationship.

### d. Skills Required

The parties do not address in great detail whether the skills required to complete Plaintiff's maintenance and carpentry work weigh in favor of employee or independent contractor status. The few facts pertaining to this factor do not weigh heavily in favor of either employment classification. Plaintiff testified that he had prior experience working for a company doing winterization work. Specifically, Plaintiff hung Visqueen—a plastic covering

used to seal openings on the sides of buildings in order to keep heat in.  He also stated that he did carpentry work for his father's company, albeit while in high school.  Defendants may have provided certain compliance standards to which Plaintiff had to adhere, but the parties raise no facts from which an inference could be drawn that Defendants trained Plaintiff in order to execute the tasks that he performed.  This undermines Plaintiff's position that he was an employee.  See Nationwide Mut. Ins. Co. v. Gretchen Courtney & Assocs., Ltd., No. 12 C 5708, 2013 WL 3790912, at *12 (N.D. Ill. July 19, 2013) ("A position that requires substantial training and supervision is indicative of an employee-employer relationship.") (citing Worth v. Tyer, 276 F.3d 249, 263 (7th Cir. 2001)).

On the other hand, Plaintiff argues that he never held licenses and that Defendants hired other individuals to do certain specialized jobs at his work site such as concrete and roofing repairs.  A lack of specialization typically weighs in favor of finding an employee/employer relationship.  See id. ("[P]ositions requiring special skills and independent judgment, by contrast, suggest that the individual is an independent contractor.").  Given these competing facts, the skills required to complete Plaintiff's duties do not factor strongly into the Court's calculus.

### e.  Duration of Working Relationship

"The more permanent the [employment] relationship, the more likely the worker is to be an employee."  Solis, 819 F. Supp. 2d at 752 (quoting Schultz v. Capital Int'l. Security, Inc., 466 F.3d 298, 309 (4th Cir. 2006)) (internal quotation marks omitted).  Here, Plaintiff correctly points out that he maintained a working relationship with Defendants for roughly six years.  Defendants do little to rebut the importance of this factor, and the Court agrees that amount of time is indicative of an employee classification.

14

In the aggregate, the foregoing considerations demonstrate that the relevant <u>Lauritzen</u> factors—including the control factor, which is afforded the most importance—show that Plaintiff was an independent contractor under the FLSA.

### ii. Other Critical Factors Revealing the Economic Relationship Between the Parties

As set forth above, the <u>Berger</u> case dictates that courts should look to factors outside of those enumerated in <u>Lauritzen</u> in order to determine the true nature of the economic relationship. <u>See</u> <u>Berger</u>, 843 F.3d 285 at 291. In this case, several factors outside of the <u>Lauritzen</u> considerations are critical in determining the true legal nature of the parties' economic relationship.

### a. The Contract and Beliefs of the Parties

The Court looks to the two contracts entered into by the parties and surrounding facts that establish Plaintiff's understanding of his employment classification. As a threshold matter, the Court rejects Plaintiff's position that "the fact that there was an independent contractor agreement…is irrelevant." Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. at 10 (internal quotation omitted). In support of this argument, Plaintiff cites to <u>Harris v. Skokie Maid & Cleaning Serv., Ltd.</u>, No. 11 C 8688, 2013 WL 3506149 (N.D. Ill. July 11, 2013). Although true that the <u>Harris</u> court found the contractual language at issue irrelevant to its analysis, that language is inapposite here. In <u>Harris</u>, the contract involved language stating that any time "worked beyond 40 hours does not count as overtime and will be paid at the rate agreed upon." <u>Id.</u> at *6. The court looked past the contract because parties cannot contract around the FLSA's minimum wages and overtime pay requirements. <u>Id.</u>

<u>Harris</u> relied on two Seventh Circuit decisions. First, in <u>Walton v. United Consumers Club, Inc.</u>, the court of appeals stated that the FLSA prohibits transacting about minimum wages

and overtime pay in the context of parties' ability to settle disputes for sub-minimum wages. 786

F.2d 303, 306 (7th Cir. 1986). Harris also relied on Lauritzen, which stated that "[t]he FLSA is

designed to defeat rather than implement contractual arrangements. If employees voluntarily

contract to accept $2.00 per hour, the agreement is ineffectual. In *other* FLSA cases we have

looked past the contractual terms." 835 F.2d at 1544-45 (Easterbrook, J., concurring) (emphasis

added) (citation omitted). The Seventh Circuit's language explains that the FLSA constrains the

terms to which parties may agree in a contract; however, it does not indicate that the terms of a

contract are universally irrelevant to an employment classification determination. Plaintiff's

argument therefore fails.

Plaintiff is correct that the label of the contract is not in and of itself dispositive—if the

independent contractor label is unsupported by the surrounding circumstances the law does not

sacrifice substance to form and deem a plaintiff an independent contractor. However, as

discussed below, Plaintiff's actions in compliance with key contractual terms and his own

understanding render the signed independent contractor agreements relevant to the economic

reality of the parties' relationship. Plaintiff fails to raise any pertinent terms in his own contract

that attempt to circumvent the statute's directives and thus run afoul of the FLSA.

Plaintiff concedes that he signed his first Independent Contractor Agreement on

November 1, 2009. Pl.'s Dep. at 35:4-12 (identifying the contract as "Independent Contractor

Agreement" and affirming his signature); DSOF, Ex. 9, Independent Contractor Agreement.

That agreement expressly provided that Plaintiff's "compensation shall become due and payable

to independent contractor upon receiving an invoice." Pl.'s Dep. at 39:1-3. Although Plaintiff's

deposition testimony goes back and forth as to whether he provided invoices or time sheets, he

does not establish a justification for distinguishing between the two, and, in any case, the record

16

ultimately reflects his admission that he followed the terms of the contract by providing invoices starting in the month that he was hired. Id. at 27:1-4 (Plaintiff affirming that he had invoices dated November 2009); id. at 67:12-18 (stating that Plaintiff continued to provide invoices in order to receive payment).

By contrast, others who were deemed employees did not invoice Defendants in order to receive paychecks. As a specific example, the parties state that Germain was an employee and that he never submitted timesheets. Furthermore, Plaintiff followed other critical terms of the contract demonstrating the parties' independent contractor relationship. For example, the contract required Plaintiff to have his own worker's compensation coverage. Plaintiff concedes that, at least until January 2011, he indeed maintained his own certificate of liability insurance that indicated his coverage for worker's compensation and employers' liability.

Plaintiff also concedes that, at the time he was hired, the parties never even verbally discussed the possibility that, contrary to the terms of the Independent Contractor Agreement, he would be Defendants' employee. These facts all strongly favor an independent contractor status.

Plaintiff's argument that the contract is not relevant because he signed the last page without ever receiving the other portions of the contract also fails. The fact is immaterial because a contract need not be read to be effective; instead, the failure to read a contract does not invalidate its unread terms nor does it excuse performance under the agreement. Hill v. Gateway 200, Inc., 105 F.3d 1147, 1148 (7th Cir. 1997) (internal citations omitted). Moreover, in 2012, Plaintiff initialed the second page and signed the last page of a second Independent Contractor Agreement. The parties agree that both contracts signed by Plaintiff contain the language that "[i]t is the parties['] intention that Independent Contractor shall have an independent contractor status and not be an employee for any purposes." Pl.'s Resp. to Defs.' Statement of Facts

17

("PRDSF") ¶ 69 (quotation in original).  Signing a second contract with terms identical to the
first agreement demonstrates that the parties understood Plaintiff to be an independent
contractor.  See Taylor v. ADS, Inc., 327 F.3d 579, 581 (7th Cir. 2003) (Title VII case where a
contract stating that the parties' intent was to create the relationship of an independent
contractor, *inter alia*, "clearly show[ed] that [the plaintiff] was *not* an employee of the
defendants.") (emphasis in original).

Finally, Plaintiff himself concedes that he "repeatedly asked his superiors at DHA to
make him a regular employee because he wanted access to all of the benefits that regular
employees had like a pension, healthcare and days off."  PRDSF at ¶ 71.  Plaintiff's own
admission states his unambiguous understanding that he was an independent contractor.
Additionally, when Cohen took over the management of Ogden, Cohen posted an opening for a
maintenance technician—the type of job Plaintiff had been doing.  Despite Plaintiff's expressed
interest, he was passed over for the job.

Plaintiff signing two separate independent contractor agreements in succession,
repeatedly expressing to his superiors his understanding that he was an independent contractor,
and failing to obtain the maintenance job—the kind of work he was doing—posted by Cohen,
strongly shows that the true nature of the parties' relationship was an independent contractor
relationship.  See Suskovich, 553 F.3d at 564 (explaining that courts are cognizant of the
freedom given to parties to create their relationship through contract and may choose to
emphasize evidence that is particularly probative of the parties' beliefs, such as an explicit
contractual definition and explaining that the belief that the plaintiff felt that he was an employee
due to the manner in which he was treated did not establish the actual belief that he was an
employee); see also Mitchell v. JCG Indus., Inc., 745 F.3d 837, 846 (7th Cir. 2014) ("Congress []

amend[ed] the Fair Labor Standards Act in 1947 to add [other provisions] stating in 29 U.S.C.
§ 251 that 'Congress finds that the Fair Labor Standards Act of 1938…has been interpreted
judicially *in disregard of long-established customs, practices, and contracts between employers
and employees*, thereby creating wholly unexpected liabilities, immense in amount and
retroactive in operation, upon employers.'") (emphasis added).

### b. Compensation

The financial factors in the case further solidify Plaintiff's status as an independent
contractor. As set forth above, Defendants paid employees via direct deposit of their paycheck
less tax withholdings. Defendants' employees did not submit invoices as a condition of
payment. Conversely, Plaintiff invoiced his hours in order to receive compensation and was paid
by paper checks, which indicates that he was an independent contractor. See Suskovich, 553
F.3d at 568 (invoiced hours, *inter alia*, demonstrated independent contractor status).

Crucially, Plaintiff's tax forms reflect those of an independent contractor. Defendants
issued him 1099 forms, and Defendants never added him to their payroll. Unlike Plaintiff, those
deemed employees received W-2 forms for tax purposes. While arguing that it "does not
override" the rest of the employee/independent contractor analysis, Plaintiff goes as far as to
concede that he "filed his taxes as an independent contractor." Pl.'s Mem. at 12. The Seventh
Circuit has explained that "a number of cases from [this circuit] hold[] that tax forms and tax
returns are essential when deciding which status [compensation methods] favor[]." Suskovich,
553 F.3d at 568. Importantly, Suskovich went further to say that "[m]ost relevant…[the Seventh
Circuit] has previously held that issuing 1099 forms, which are used for non-employee
compensation, 'would be appropriate for independent contractor status.'" Id. (citing North Knox
School Corp., 154 F.3d at 750); see also Taylor, 327 F.3d at 581 (Title VII case finding that 1099

forms and document checking blank for "Independent Contractor Driver," *inter alia*, "clearly

show[ed] that [the plaintiff] was *not* an employee of the defendants.") (emphasis in original);

Mazzei v. Rock N Around Trucking, Inc., 246 F.3d 956, 964 (7th Cir. 2001) ("The owner-

drivers are paid on a Form 1099 basis…which we have held would be appropriate for

independent contractors.") (internal citation and quotation omitted).

On Plaintiff's own tax returns, he reported income from his personal business—a sole

proprietorship—consistently throughout the duration of his working relationship with

Defendants.  Plaintiff reported $16,367, $25,292, $23,060, $22,313, $22,997, and $15,949 as

income from his own business from 2010-2015, respectively.  The tax returns provided details

describing expenses including tools, equipment, and vehicle usage, and Plaintiff reduced his

taxable income by claiming these expenses related to his personal business—all of which are tax

deductions indicative of an independent contractor status.  Thus, the tax documents strongly

favor a finding that Plaintiff was an independent contractor.

Plaintiff asserts the contrary position that the issuance of 1099 forms is irrelevant to the

calculus.  The Court rejects the argument, as Plaintiff's authority is unavailing.  He looks for

support from a case in the Southern District of Florida where the court found that a plaintiff

receiving a 1099 form did not weigh in favor of finding him to be an independent contractor.

However, the Florida court did not state this as a universal proposition.  Rather, in the context of

that case, the court found the issuance of Form 1099s unpersuasive because the employer

"provided even clerical workers with 1099s."  Olson v. Star Lift Inc., 709 F. Supp. 2d 1351,

1356 (S.D. Fla. 2010).  Additionally, the plaintiff in that case received all of his insurance

coverage through the employer.  Id.  The context of this case is just the opposite—other

individuals deemed employees were not issued 1099s, and Plaintiff did not obtain his benefits through Defendants. Plaintiff's authority has no application here.[7]

Finally, the parties provide salary figures for the DHA employees as compared to Plaintiff's income. Plaintiff concedes that, at least at certain times, he out-earned all of the individuals that he alleges are employees and his superiors. For example, Plaintiff received $62,940 in 2014. At the same time, Barney's salary was $50,532.30, Cyndi's salary was $45,363.24, Demetry's salary was $61,582.56, and Laraia's salary was $42,435.12. Germain made $42,521 in 2012 before he separated from DHA in early 2013. Plaintiff provides no legitimate explanation for why, if he were indeed an employee, his alleged *superiors* made less money than he did.

Plaintiff's only attempt at explaining the discrepancy is that the employees' salaries are less than his compensation because the dollar figures do not include the value of the other employees' pensions, health insurance plans, and other fringe benefits. Unlike the aforementioned employees who received insurance benefits through DHA, Plaintiff confirmed at his deposition that he, at least at times, met insurance requirements set forth by DHA as conditions of their working relationship. Plaintiff admitted that by as early as the second or third week of their working relationship, the parties had discussed these insurance requirements. The fact that Plaintiff did not receive benefits typically afforded to employees undermines his position that he was an employee and instead cuts in favor of Defendants. See North Knox School Corp., 154 F.3d at 750 (finding that the fact plaintiffs received no benefits other than their contractual compensation and received Form 1099s rather than W-2 tax forms weighed in favor of an independent contractor classification); see also Stone v. Pinkerton Farms, Inc., 741

---

[7] Plaintiff also relies on a Department of Labor explanation that labels of independent contractor are not relevant in a misclassification analysis. However, the electronic link provided in Plaintiff's brief resulted in a "Page Not Found" notice.

F.2d 941, 944 (7th Cir. 1984) (noting that a company's payment of insurance premiums weighed in favor of employee status).

"[A]s with most employee-status cases, there are facts pointing in both directions." Carrell, 998 F.2d at 334. However, considering the Lauritzen factors, the parties' contracts, Plaintiff's tax documents, the method of payment, Plaintiff's income relative to his alleged superiors, and the fact that Defendants did not provide Plaintiff with benefits, the economic realities are consistent with an independent contractor relationship pursuant to the FLSA. See Suskovich, 553 F.3d at 569. ("[T]he tax returns…tax forms, and contractual agreement…which explicitly disclaims an employer-employee relationship—overwhelmingly favors the conclusion that [the plaintiff] considered himself an independent contractor.").

While true that the parties dispute certain facts, a genuine dispute requires more than "some metaphysical doubt as to the material facts." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 261 (1988) (internal citation and quotation omitted). The disputed facts in this case would not sway the legal determination; to the contrary, no rational trier of fact could find for Plaintiff as to the issue of employment status under the FLSA. Summary judgment in favor of Defendants is therefore proper regarding Plaintiff's FLSA claim.

### III. Conclusion

Plaintiff concedes that Defendants are entitled to summary judgment on the FMLA claim. Additionally, both the Lauritzen factors and other pertinent considerations show that, given the totality of the circumstances, Plaintiff was an independent contractor under the FLSA. As a result, Plaintiff's motion for summary judgment is denied, and Defendants' motion for summary judgment is granted as to both the FMLA and FLSA claims. Having resolved all federal causes of action, Defendants' motion is denied without prejudice as to the remaining state law claims

for violations of the IMWL, IECA, and IPWA; the Court relinquishes jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3). See City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172-74 (1997); see also Groce v. Eli Lilly & Co., 193 F.3d 496, 500-01 (7th Cir. 1999). The state law claims may be filed in the appropriate state court.

IT IS SO ORDERED.

ENTER:

_____

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: August 1, 2017