IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY SIMPKINS, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | No.: 15 cv 9103 |
| ) | |
| DUPAGE HOUSING AUTHORITY and DHA ) | Judge: Charles R. Norgle, Sr. |
| MANAGEMENT, INC., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTS III AND IV**

NOW COME Defendants, DUPAGE HOUSING AUTHORITY and DHA MANAGEMENT, INC., by and through their attorneys, Steven B. Borkan, Graham P. Miller, and Nicholas K. Fedde of Borkan & Scahill, Ltd., and pursuant to Fed. R. Civ. P. 56 move this Court again for summary judgment in their favor and against Plaintiff, Anthony Simpkins, as to Counts III and IV of the Complaint. In support thereof, Defendants state as follows:

**SUMMARY OF UNDISPUTED MATERIAL FACTS**[1]

Defendant DuPage Housing Authority ("DHA") is a municipal corporation created pursuant to the Illinois Housing Authorities Act ("Housing Act") and is charged with administering various federal and state housing programs. SMF ¶ 1.[2] Its Board of Commissioners is appointed by the President of DuPage County's Board of Commissioners. SMF ¶ 1. DHA is reported as a "county or county agency" in its retirement plan filings. SMF ¶ 5. DHA acts as a local government entity in all respects except its inability to levy taxes and, instead, is funded by grants and subsidies

---

[1] Certain facts stated herein and in Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Their Renewed Motion for Summary Judgment on Counts III and IV are construed in a light most favorable to Plaintiff for purposes of this Motion but may be contested by Defendants at trial.

[2] Citations herein are as follows: Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Their Renewed Motion for Summary Judgment on Counts III and IV = "SMF ¶ ___".

1

from other government bodies. SMF ¶ 1. Its self-declared mission statement is: "To serve and empower the people of DuPage County needing assistance obtaining decent, safe, sanitary and affordable housing in DuPage County, through a proactive administration of public programs, funds, and cooperation with other public and private agencies dedicated to the improvement of housing and human development." SMF ¶ 3. DHA focuses its efforts on administering programs such as HUD's Housing Choice Voucher program and certain state housing programs. SMF ¶ 1. Through a nonprofit subsidiary, DHA owns Ogden Manor, an apartment and townhome community supported through a project-based federal housing grant. SMF ¶ 4. DHA also administers a Neighborhood Stabilization Program ("NSP"), which involves rehabbing vacant homes and making them available to occupants. SMF ¶ 1.

Defendant DHA Management, Inc. ("DHA Management") was a non-profit subsidiary of DHA designated as the on-site management entity for Ogden Manor. SMF ¶ 4. It had no employees. SMF ¶ 8. DHA Management received its operating income from government grants. SMF ¶ 7. It was completely controlled by DHA. SMF ¶ 6. DHA's Executive Director and Board members held those same positions for DHA Management. SMF ¶ 6. DHA Management's assets and financial activity were rolled into DHA's financial statements for public reporting. SMF ¶ 7. DHA Management did not have its own office, and its registered address was the same address as DHA's office. SMF ¶ 6. Essentially, whatever was being done through DHA Management was being carried out by DHA. SMF ¶ 6.

Plaintiff worked with DHA for roughly five-and-a-half years. SMF ¶¶ 9, 16. The relationship began in November 2009, SMF ¶ 9, around which time Plaintiff signed an Independent Contractor Agreement for "[g]eneral labor as needed to complete rehab of NSP properties." SMF ¶¶ 9-10. As required by the agreement, Plaintiff obtained his own workers' compensation policy along with a Certificate of Liability Insurance. SMF ¶ 10. Around October 2011, the NSP rehab work slowed

down and Plaintiff began working on rehabbing townhomes at Ogden Manor. SMF ¶ 11. Upon completion of that project, his work became primarily focused on maintenance at Ogden Manor. SMF ¶ 11. Accordingly, Plaintiff signed another Independent Contractor Agreement, dated May 2012, with DHA for "[g]eneral labor for maintenance" at Ogden Manor. SMF ¶¶ 12-13. Maintenance work at Ogden Manor continued to be Plaintiff's focus until the relationship ended. SMF ¶ 11. Such work is now the responsibility of a third-party property management company, and DHA does not employ any maintenance persons. SMF ¶¶ 4, 14-15.

DHA issued Plaintiff IRS 1099 forms for his pay and did not deduct or withhold taxes. SMF ¶ 20. Plaintiff paid self-employment taxes on his income from DHA, which he offset by claiming substantial business expenses in the form of vehicle usage and tools, equipment, and gear purchased for work. SMF ¶ 21. DHA employees who interacted with Plaintiff knew him to be an independent contractor. SMF ¶ 17. He often wore tank tops, basketball shorts, and gym shoes to work, all of which violated the dress code applicable to DHA employees. SMF ¶ 17. Once projects were assigned to Plaintiff, it was usually up to him how to execute them, and he was left on his own to do so. SMF ¶ 18. With the exception of urgent projects, he was left to complete projects in the order he saw fit. SMF ¶ 18. Both Independent Contractor Agreements contained provisions stating Plaintiff was not required to follow a regular or daily work schedule, and Defendants could give suggestions but not instruction as to the means and methods of his work. SMF ¶ 19.

## ARGUMENT

**I. PLAINTIFF IS NOT A COVERED CLAIMANT UNDER THE PWA (COUNT IV) REGARDLESS OF HIS EMPLOYMENT STATUS.**

If Plaintiff was Defendants' employee as he alleges, Defendants are not liable because they are public bodies whose employees are not proper claimants under the Illinois Prevailing Wage Act ("PWA"). If Plaintiff was an independent contractor as Defendants allege, then the count fails because such contractors are also not covered thereunder. Ether way, summary judgment is proper.

### A. The PWA Does Not Provide Independent Contractors With A Private Cause of Action, So Plaintiff's Claim Fails If He Had Such Status.

A private cause of action under the PWA is available only to employees against their employers. Such cause is established in Section 11, which states in pertinent part:

> Any laborer, worker or mechanic *employed* by the contractor or by any sub-contractor under him who is paid for his services in a sum less than the stipulated rates for work done under such contract, shall have a right of action for whatever difference there may be between the amount so paid, and the rates provided by the contract.

820 ILCS 130/11 (emphasis added); *see also Cent. Laborers' Pension Fund v. Nicholas & Associates, Inc.*, 2011 IL App (2d) 100125, ¶ 47 ("Under section 11, an employee or an employee representative may sue a contractor or subcontractor in state court to recover the difference between the wages paid and the 'prevailing wage' as defined in section 2."); *People ex rel. Dept. of Labor v. Valdivia*, 2011 IL App (2d) 100998, ¶ 13 ("The [PWA] requires both general contractors and subcontractors on public-works projects to pay the prevailing wage to their *employees*." (emphasis added)).

Moreover, Section 3 (discussed *infra*), which establishes the right to and breadth of the prevailing rate, is titled "Generally prevailing wages to be paid; *employees* included." 820 ILCS 130/3 (emphasis added). All the above firmly establishes that only employees are covered claimants under the PWA. Thus, if Plaintiff was an independent contractor, his PWA claim fails as a matter of law.

### B. As A Public Body, Defendants Are Exempt From Liability To Their Own Employees Under The PWA.

Assuming *arguendo* that Plaintiff was Defendants' employee, summary judgment is again proper. Both the plain language of the PWA and interpreting case law establish that public bodies are not required to pay their employees prevailing wages under the statute. As stated in Section 3:

> Not less than the general prevailing rate of hourly wages for work of a similar character on public works in the locality in which the work is performed, and not less than the general prevailing rate of hourly wages for legal holiday and overtime work, shall be paid to all laborers, workers and mechanics *employed by or on behalf of any public body* engaged in the construction or demolition of *public works*.

4

820 ILCS 130/3 (emphasis added). Despite the ambiguous "employed by or on behalf of" language above, Section 3 goes on to clarify that:

> Only such laborers, workers and mechanics *as are directly employed by contractors or subcontractors* in actual construction work on the site of the building or construction job . . . in the execution of *any contract or contracts* for public works *with any public body* shall be deemed to be employed upon *public works*."

*Id.* (emphasis added). Thus, the statute draws the distinction between direct employees of contractors and subcontractors on the one hand (covered by the PWA), and the public bodies who hire the contractors on the other hand, whose own employees are not mentioned in the statute.

In an early case dealing with a previous but similarly-worded version of the PWA, the Illinois Supreme Court held the statute did not apply to persons directly employed by public bodies. *Bradley v. Casey*, 415 Ill. 576, 581 (1953). Thereafter, through amendment the legislature attempted to extend the PWA's coverage to "employees of public bodies when engaged in new construction." *City of Monmouth v. Lorenz*, 30 Ill. 2d 60, 62-63 (1963). However, in *Monmouth*, the Illinois Supreme Court struck down that part of the legislation that imposed upon public bodies the obligation to pay prevailing wages to their own employees, finding that part of the act violated the federal and Illinois constitutions. *Id.* at 67. In *Seybold v. City of Chicago*, 7 Ill. App. 3d 932, 934 (1972), the court applied *Monmouth* and held once again that employees of public bodies were exempt from the PWA, stating:

> The Court [in *Monmouth*] held without limitation and without exception that the placement of construction contractors and public bodies in the same class for the purpose of calculating required monetary compensation was unconstitutional since 'the two classes of employers are by their very nature in such a position that they cannot and do not confer similar economic benefits on their employees exclusive of the rate of pay.'

*Id.* (affirming dismissal of a PWA suit by ironworkers employed by the city).

Turning to the meaning of "public body," that term is defined in the PWA as:

> The State or any officer, board or commission of the State or *any political subdivision* or department *thereof*, or *any institution supported in whole or in part by public funds*, and *includes every county*, city, town, village, township, school district, irrigation, utility, reclamation improvement or other district and *every other* political subdivision, district or

5

*municipality* of the state whether such political subdivision, municipality or district operates under a special charter or not.

820 ILCS 130/2 (emphasis added).

### 1. DHA Was A Public Body.

DHA fits squarely within the foregoing expansive definition of a "public body," whose employees are excluded from the prevailing wage requirement. DHA is a public entity organized as a municipal corporation, SMF ¶ 1, thereby making it a "municipality" which is expressly included in the definition. *See Black's Law Dictionary* (11th ed. 2019), *available at* Westlaw BLACKS (defining "municipal corporation" as "[a] city, town, or other local political entity formed by charter from the state and having the autonomous authority to administer the state's local affairs; esp., a public corporation created for political purposes and endowed with political powers to be exercised for the public good in the administration of local civil government. — Also termed *municipality*; statutory corporation." (emphasis added)).

Moreover, DHA is like any other municipal entity except it does not have the power to levy taxes. SMF ¶ 1. Instead, it receives its income from other sources of public funds. *Id.* Thus, DHA also satisfies the PWA's definition of "public body" because it is an "institution supported in whole or in part by public funds." Finally, DHA qualifies as a "public body" because it is a "political subdivision" of the State of Illinois. (See discussion at Section II.A.1, *infra*). For all these reasons, DHA is a "public body" under the PWA and, therefore, not liable thereunder to its own employees. Accordingly, Plaintiff is not covered under the PWA to the extent he claims to be one of them.

### 2. DHA Management Was A Public Body.

On its own, DHA Management qualified as a "public body" so as to exclude its employees from coverage under the PWA (not that it had any). As discussed above, the definition of public body includes "any institution supported in whole or in part by public funds." 820 ILCS 130/2; *People ex rel. Bernardi v. Illini Cmty. Hosp.*, 163 Ill. App. 3d 987, 990 (4th Dist. 1987) (holding that

nonprofit hospital's funding through tax monies qualified it as a public body: "Here, the hospital received tax monies. The fact that it would not be a public hospital for purposes of other statutes does not control the definition of public body included in the Prevailing Wage Act."). Here, DHA Management received its operating income from government grants, *i.e.* public funds. SMF ¶ 7. Thus, DHA Management falls squarely within the definition of "public body." Moreover, DHA Management also meets the definition because it should be treated as the same unitary entity as DHA. (See discussion at Section II.A.2, *infra*). Therefore, based on either of these grounds, Plaintiff is not covered under the PWA to the extent he claims he was DHA Management's employee.

In sum, regardless of whether Plaintiff was an independent contractor or an employee of either of Defendants, he has no standing to bring a cause of action under the PWA. Therefore, Defendants are entitled to summary judgment as to Count IV.

## II. DEFENDANTS ARE EXEMPT FROM LIABILITY UNDER THE ECA (COUNT III) AND PLAINTIFF WAS NOT THEIR EMPLOYEE THEREUNDER.

### A. As An Agency Or Political Subdivision Of The State Of Illinois, Defendants Are Exempt From Liability Under The ECA.

Defendants must be granted summary judgment as to Count III, first, because as a matter of law they are exempt from liability under the Illinois Employee Classification Act ("ECA") as an agency or political subdivision of the State. Under the ECA, private right of action extends to "a person aggrieved by a violation of th[e] [ECA] or any rule adopted under th[e] [ECA] *by an employer or entity*." 820 ILCS 185/60 (emphasis added). The ECA defines "employer" as "any contractor that employs individuals deemed employees under Section 10 of [the ECA]; however, 'employer' does not include (i) the *State of Illinois or its* officers, *agencies, or political subdivisions* or (ii) the federal government." 820 ILCS 185/5 (emphasis added). The term "entity" has the same exclusion and is defined as "any contractor for which an individual is performing services and is not classified as an employee under Section 10 of [the ECA]; however, 'entity' does not include (i) *the State of Illinois or its*

7

officers, *agencies, or political subdivisions* or (ii) the federal government." *Id.* (emphasis added). Thus, taken together, the foregoing establishes that no private cause of action exists against agencies or political subdivisions of the State of Illinois. As set forth below, Defendants fit this exemption.

### 1. *DHA Is An Exempted Agency Or Political Subdivision Of The State.*

The undisputed facts show DHA fits within the ECA's exemption for the State's agencies and political subdivisions. DHA is a public entity organized as a municipal corporation. SMF ¶ 1. In fact, DHA is like any other local government entity except it cannot levy taxes. *Id.* Instead, it relies on other public funding. *Id.* DHA serves the important government function of administering federal and state housing programs. *Id.* Additionally, DHA is an extension of county government in that its Board of Commissioners is appointed by the President of DuPage County's Board of Commissioners. *Id.* In fact, DHA is reported as a "county or county agency" in its retirement plan filings. SMF ¶ 5. All these factors, in aggregate, point to DHA as an exempt agency or political subdivision of the State.

Although there is a dearth of case law interpreting the state-agency-or-political-subdivision exemption under the ECA, support can be found in cases applying similar statutory carve-outs to housing authorities. *See Brooks v. Chi. Hous. Auth.*, No. 89 C 9304, 1990 WL 103572, at *1, 3 (N.D. Ill. July 5, 1990) (where housing authority was created pursuant to the Housing Act, the court held it fit within the liability exemption for "any State or political subdivision thereof" under the Labor Management Relations Act, reasoning that, under the Housing Act, the mayor appointed and could remove the housing authority's commissioners and, thus, the housing authority was "responsible to public officials"); *Chi. Hous. Auth. for Use of Gen. Bronze Corp. v. U.S. Fid. & Guar. Co.*, 49 Ill. App. 2d 407, 409 (1st Dist. 1964) (treating housing authority as political subdivision of Illinois for purposes of statute requiring contractor bond); *Issa v. Chi. Hous. Auth.*, No. 01 C 9439, 2002 WL 909279, at *2-3 (N.D. Ill. May 6, 2002) (housing authority held to be a political subdivision of state government

for purposes of exemption from federal subject matter jurisdiction under ERISA); *W. Waterproofing Co., Inc. v. Springfield Hous. Auth.*, 669 F. Supp. 901, 903 n.1 (C.D. Ill. 1987) ("It has been held that a housing authority is a political subdivision and therefore subject to the provisions of the Bond Act.").

"The general test for determining whether an employer is an exempt political subdivision is whether it was (1) created directly by the state, so as to constitute a department or administrative arm of the government, or (2) is administered by individuals who are responsible to public officials or to the general electorate." *Brooks*, 1990 WL 103572, at *1; *Issa*, 2002 WL 909279, at *2. Here, as in *Brooks*, DHA is a housing authority created pursuant to the Housing Act, which grants DuPage County's "presiding officer" the authority to appoint and remove DHA's commissioners. *See* 310 ILCS 10/3-4; SMF ¶¶ 1-2. In this way, DHA is responsible to public officials, thereby meeting the definition of political subdivision per the general test and, thus, exempt from the ECA. For all these reasons, DHA is an agency or political subdivision of the State and, thus, not subject to the ECA.

### 2. **DHA's Exemption Extends To DHA Management.**

DHA Management is exempt from liability under the ECA due to its relationship to DHA. For all intents and purposes here, DHA Management was just an extension of DHA. DHA Management was organized as a nonprofit but had no employees. SMF ¶¶ 6, 8. It was a wholly-owned subsidiary completely controlled by DHA. SMF ¶ 6. DHA's Executive Director and Board members held those same positions for DHA Management. SMF ¶ 6. DHA Management's assets and financial activity were rolled into DHA's financial statements for public reporting. SMF ¶ 7. DHA Management did not have its own office, and its registered address was the same address as DHA's. SMF ¶ 6. Essentially, whatever was being done through DHA Management was being carried out by DHA. *Id.*

While there is no ECA-specific case law on this issue, much can be borrowed from cases applying the same principle under the Illinois Tort Immunity Act (the "Act"). For example, in *Barnes v. Chicago Housing Authority*, 326 Ill. App. 3d 710 (1st Dist. 2001), the court affirmed summary judgment for the defendant, a nonprofit resident management corporation, upon holding that it was a local public entity immune from liability under the Act. The court considered relevant that the defendant functioned under the supervision of and in cooperation with the municipal housing authority, and that it was government funded. *Id.* The court also reasoned the defendant stepped into the shoes of the housing authority under which it operated for purposes of the management services it provided for the housing development and, in doing so, participated in the business of government. *Id.* The Illinois Supreme Court later cited *Barnes* in agreement: "Such close interaction and comprehensive governmental control of a nonprofit corporation exemplify the characteristics of the type of organization that may be able to qualify for immunity as a 'local public entity.'" *Brugger v. Joseph Acad., Inc.*, 202 Ill. 2d 435, 440 (2002). Similarly, in *Smith v. Northern Ill. Regional Commuter Railroad Corp.*, 210 Ill. App. 3d 223 (1st Dist. 1991), the court extended the Act's immunity to a nonprofit corporation owned by a municipal corporation. As the court reasoned: "Appellant's analysis of applicable statutes and case law would subject METRA to punitive damage liability under the [Act] for carrying on a public transportation function which its parent RTA could perform exempt from such liability. That result makes no sense and furthers no worthwhile social or governmental policy." *Id.* at 228. Here, too, DHA Management is a nonprofit corporation owned by a municipal corporation, DHA, the latter of which is exempt from liability under the ECA. Here, too, it makes no sense and furthers no worthwhile policy to subject DHA Management to the obligations under the ECA while its parent is rightfully exempt.

Also instructive to this case are Supreme Court cases treating state-owned enterprises the same as the governments who own them. In such instances, "the one thing that can be said with

confidence … is that the Supreme Court has eschewed bright-line rules in favor of a more functional approach to the matter." *Amoco Corp. v. C.I.R.*, 138 F.3d 1139, 1146 (1998). Further, "[i]n discussing the legal status of private corporations, courts . . . have recognized that an incorporated entity . . . is not to be regarded as legally separate from its owners in all circumstances." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628 (1983).

In *Amoco*, the Supreme Court held that for tax purposes, Egypt's wholly-owned petroleum corporation, whose board was appointed by the Egyptian President and Prime Minister, should be treated as the same "unitary entity" as the Egyptian government "even if in other contexts it would be appropriate to recognize [the company] as a separate corporate body." *Amoco*, 138 F.3d at 1140, 1149. The court "d[id] not find dispositive" the fact that the subject regulations defined the term "foreign country" narrowly to mean "any foreign state, … and any *political subdivision* of any foreign state." *Id.* at 1147 (emphasis added). Instead, the Court took a functional approach to treat the petroleum company as the country which owned it. *Id.*

In *Department of Transportation v. Association of American Railroads*, 135 S. Ct. 1225, 1232-33 (2015), the Supreme Court held that Amtrak, a private for-profit corporation whose stock and board were controlled by the federal government, acted as a government entity for the purposes of overcoming a constitutional challenge, despite that Amtrak's birthing statute expressly declared it was "not a department, agency, or instrumentality of the United States Government." *See also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995) ("We hold that where, as here, the Government creates a corporation … and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment"). Finally, in *First National*, the Supreme Court held that a credit institution, which was a private corporation established and owned by the Cuban government, should be considered the

same entity as that government for the purpose of allowing a bank to claim a setoff against the institution's suit. *First Nat'l*, 462 U.S. at 618-19, 632.

The foregoing cases illustrate the many scenarios where a private corporation is treated as the public body that owns and controls it. Here, too, the Court should take a functional approach and treat DHA Management as the same unitary entity as DHA, which is exempted from the ECA.

In sum, Defendants are not a covered "employer or entity" under the ECA because they fall under the exemption for the State's agencies and political subdivisions. Therefore, this Court should grant summary judgment in favor of Defendants as to Count III.

### B. Plaintiff Was Not An Employee Under The ECA.

Count III is ripe for summary judgment, second, because the undisputed facts establish Plaintiff was not an employee as defined by the ECA. For the purposes of the ECA as relevant here, an individual performing services for a contractor is deemed an "employee" of the contractor unless the following three conditions are established: (1) the individual is free from control or direction over the performance of the services, both under his contract and in fact; (2) the service he performs is outside the usual course of services performed by the contractor; and (3) he is engaged in an independently established trade, occupation, profession or business. 820 ILCS 185/10(a)-(b); *Jaworski v. Master Hand Contractors, Inc.*, No. 09 C 07255, 2013 WL 1283534, at *8 (N.D. Ill. Mar. 27, 2013). The record amply demonstrates all three prongs of the test are met as set forth below.

#### 1. *Plaintiff's Work Satisfies The First Condition For Non-Employee Status.*

The first condition to rebut employee status is met here based on several undisputed facts that, in aggregate, demonstrate Plaintiff was free from control or direction over the performance of his services, *both under his contract and in fact. See* 820 ILCS 185/10(b)(1). Plaintiff often performed his work in tank tops, athletic shorts, and gym shoes, all of which violated the dress code for DHA employees. SMF ¶ 17. Once projects were assigned to Plaintiff, it was usually up to him how to

12

execute them, and he was left on his own to do so. SMF ¶ 18. With the exception of urgent projects, he was left to complete projects in the order he saw fit. *Id.* Further, by virtue of the Independent Contractor Agreements executed by the parties, Plaintiff was not required to follow a regular or daily work schedule, and Defendants could give suggestions but not instruction as to the means and methods of Plaintiff's work. SMF ¶ 19. Considering all the foregoing facts, Plaintiff's services clearly satisfy part one of the three-part test.

    **2.    *Plaintiff's Work Satisfies The Second Condition For Non-Employee Status.***

Turning to the second condition necessary to rebut employee status, the record establishes that the services Plaintiff performed were "outside the usual course of services performed by" Defendants, *see* 820 ILCS 185/10(b)(2). As a preliminary matter, of the two named Defendants, DHA is the only one that ever had employees and the one who contracted with Plaintiff for maintenance work at Ogden Manor, which was the primary focus of his work for at least the last three years of the relationship. SMF ¶¶ 11-13, 16. Thus, DHA's shell subsidiary, DHA Management, cannot be reasonably construed as the employing "contractor" for this analysis.

For DHA, the usual course of services it performed, as a county housing authority, was administering federal and state housing programs, not providing building maintenance. SMF ¶ 1. DHA was created pursuant to the Housing Act, which vested in DHA along with other housing authorities the following powers: "[A]ll powers necessary or appropriate in order that they may engage in low-rent housing and slum clearance projects, and provide rental assistance, and undertake land assembly, clearance, rehabilitation, development, and redevelopment projects as will tend to relieve the shortage of decent, safe, affordable, and sanitary dwellings." *See* 310 ILCS 10/2; SMF ¶¶ 1-2.

Continuing, DHA's self-declared mission statement is: "To serve and empower the people of DuPage County needing assistance obtaining decent, safe, sanitary and affordable housing in

DuPage County, *through a proactive administration of public programs*, funds, and cooperation with other public and private agencies dedicated to the improvement of housing and human development." SMF ¶ 3 (emphasis added). As DHA's Executive Director, Kenneth Coles ("Coles"), testified at his deposition, indeed, DHA focuses its efforts on administering such public programs, including HUD's Housing Choice Voucher program and certain state housing programs. SMF ¶ 1. Thus, the "usual course of services performed by" DHA was the broad administration of housing programs across the county as needed to solve the shortage of affordable housing, and Plaintiff's routine building maintenance services fell "outside" this scope.

That maintenance work fell outside the usual course of DHA's services is further supported by additional facts. First, DHA has since outsourced Ogden Manor's maintenance needs to a third-party property management company. SMF ¶¶ 14-15. Second, as Coles testified in his second declaration, DHA does not need to employ maintenance persons to fulfill its mission, it currently employees no maintenance persons whatsoever, and its was rated a "high performer" by HUD multiple years before ever owning its first and only residential building, Ogden Manor. SMF ¶ 4. Clearly, maintenance work was not within the usual course of DHA's services.

### 3. *Plaintiff's Work Satisfies The Third Condition For Non-Employee Status.*

Defendants establish the third and final condition necessary to rebut Plaintiff's employee status through a plethora of undisputed facts that, together, demonstrate he was engaged in an independently established trade, occupation, profession, or business. *See* 820 ILCS 185/10(b)(3). Specifically, Plaintiff's workers' compensation policy, certificate of insurance, self-employment taxes, Independent Contractor Agreements, and significant personal business expenses claimed each year are, together, sufficient indicia that Plaintiff was engaged in an independently established business. SMF ¶¶ 9-10, 12, 19-21. Because all three conditions are met, Plaintiff's ECA claim should not survive summary judgment. *See Michael v. Pella Products, Inc.*, 2014 IL App (1st) 132695, ¶ 34

(affirming summary judgment for putative employer against window installer's ECA claim); *Zampos v. W & E Communications, Inc.*, 970 F. Supp. 2d 794, 807 (N.D. Ill. 2013) (summary judgment for putative joint-employer against ECA claim).

In short, Defendants were exempt from liability under the ECA as a matter of law, and the material facts are uncontroverted in showing that Plaintiff was not Defendants' employee under the ECA. Accordingly, Defendants are entitled to summary judgment for Count III on either of these grounds.

## CONCLUSION

WHEREFORE Defendants, DUPAGE HOUSING AUTHORITY and DHA MANAGEMENT, INC., pray this Honorable Court grant summary judgment in their favor and against Plaintiff, Anthony Simpkins, as to Counts II and III of the Complaint; and for any additional relief this Court deems appropriate.

Respectfully submitted,

BORKAN & SCAHILL, LTD.

By: /s/ Nicholas K. Fedde
     Nicholas K. Fedde

Steven B. Borkan (6193463)
Graham P. Miller (6290240)
Nicholas K. Fedde (6317358)
BORKAN & SCAHILL, LTD.
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
(312) 580-1030